IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

TAMARA K. REDNOSE,           )
                             )
        Plaintiff,           )
                             )
                             )   CIV-13-752-F
v.                           )
                             )
CAROLYN W. COLVIN,           )
  Acting Commissioner of Social  )
  Security Administration,   )
                             )
        Defendant.           )

## REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying her applications for disability insurance and supplemental security income benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 416(I), 423, 1382. Defendant has answered the Complaint and filed the administrative record (hereinafter TR___), and the parties have briefed the issues. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). For the following reasons, it is recommended that the Commissioner's decision be affirmed.

I. Background

Three days before her 44th birthday Plaintiff protectively filed her applications for

benefits in July 2010. (TR 126, 130, 140). Plaintiff alleged she was disabled due to bipolar disorder, depression, dyslexia, and Paget disease. (TR 164). Plaintiff has a twelfth grade education, and she previously worked as an assistant manager of a grocery store, retail salesperson, waitress, vocational rehabilitation coach, and assistant manager of a garden center. (TR 165, 173). In a function report completed for the agency in August 2010 (TR 181-188), Plaintiff stated she had recently undergone two surgical procedures on her right breast. She was living with a friend and would be undergoing radiation treatment for six weeks. Plaintiff's son also completed a third party function report in February 2011. (TR 199-207).

In an administrative hearing conducted on December 8, 2011, before Administrative Law Judge Gordon ("ALJ")(TR 28-52), Plaintiff testified that she quit working in January 2010 because of difficulty with her right breast and stress. Plaintiff stated that as a result of radiation treatment for Paget disease in her right breast she had shortness of breath and could not lift her right arm above shoulder level. She also described hand numbness, anxiety, difficulty concentrating, and difficulty sleeping. Plaintiff testified these symptoms and pain resulting from her treatment prevented her from working. She testified that following completion of her radiation treatments she had undergone physical therapy for one month but stopped due to lack of money. Her activities included watching television, using a computer, spending time with her grandchildren, doing laundry, cleaning her room, and taking care of her personal needs. Plaintiff stated she could lift ten to fifteen pounds and that her medications, Celexa® and Trazodone®, made her lethargic. A vocational expert ("VE") also

2

testified at the hearing.

The medical record reflects that Plaintiff was diagnosed with Paget disease in May 2010 after undergoing a biopsy and MRI testing. (TR 232, 235). The MRI testing showed no evidence of malignancy elsewhere in the right breast or anywhere in the left breast. (TR 323). Dr. Boggs, Plaintiff's surgeon, noted that Plaintiff chose breast conservation followed by irradiation therapy as opposed to mastectomy as treatment for her Paget disease. (TR 466). In June 2010, Dr. Boggs performed a semental mastectomy on Plaintiff's right nipple and diagnosed Plaintiff with ductal carcinoma in situ, nuclear grade three, with no invasive carcinoma. (TR 251-253, 257). In July 2010, Dr. Boggs performed a re-excision of deep margin tissue in Plaintiff's right breast and opined that Plaintiff's breast showed no residual ductal carcinoma in situ. (TR 277, 279, 488).

Dr. Reeves evaluated Plaintiff in August 2010 and noted that she had "healed up nicely" and was a good candidate for breast radiation treatment. At that time Plaintiff reported she was taking Ritalin® and Sudafed® and working as a waitress. (TR 299). Plaintiff complained only of occasional swelling in her ankle and otherwise stated she was "doing well." (TR 300).

In August 2010, Plaintiff was evaluated by Dr. Prabhu who noted that Plaintiff was working "a variety of jobs at present" as a waitress, landscaper, and "has a hardwood floor business." (TR 326). On examination, Plaintiff exhibited no neurological or extremity problems, and Dr. Prabhu recommended irradiation treatment of her right breast for six weeks. (TR 328). Dr. Prabhu noted that Plaintiff's Paget disease was of pathological "stage

O."[1] (TR 366).

Plaintiff underwent the radiation treatments conducted by Dr. Prabhu, and Dr. Prabhu noted she completed the treatments in October 2010. (TR 421). In an end-of-treatment summary report, Dr. Prabhu noted that Plaintiff "did reasonably well through the course of radiation" and she experienced only "the expected skin changes . . . that responded to topical skin measures." (TR 449-450).

Plaintiff's primary physician, Dr. Keast, noted that Plaintiff was treated with topical medication for radiation burns to her right breast in January 2011 and that she exhibited reduced range of motion in her right upper extremity. (TR 473). She was referred for physical therapy.

Plaintiff was re-evaluated by Dr. Boggs in January 2011, and Dr. Boggs noted Plaintiff exhibited "mild residual erythema" in her right breast and "slightly limited abduction" in her right upper extremity. (TR 484). Plaintiff's lungs were clear without wheezing or rales. Pulmonary function testing of Plaintiff conducted in February 2011 was interpreted as "probably normal spirometry." (TR 519).

Plaintiff began physical therapy in January 2011 but only attended three sessions and stopped attending therapy appointments during the fourth week. (TR 512).

In February 2011, Plaintiff returned to Dr. Prabhu for follow-up evaluation. (TR 571-

---

[1]Paget disease can be classified into four clinical stages, and stage O means that the "lesion is confined to the epidermis, without underlying in situ ductal carcinoma of the breast." http://radiopaedia.org/articles/paget-disease-of-the-breast-1.

4

572). Dr. Prabhu noted that Plaintiff complained of some right-sided breast pain and tenderness and reported she was undergoing physical therapy to increase her range of motion in her right shoulder. Plaintiff wanted to undergo breast reconstruction/reduction procedures. Dr. Prabhu noted that a physical examination of Plaintiff was normal except for some scars, mild swelling, and limited range of motion in her right shoulder. A mammogram conducted in January 2011 was benign, and Plaintiff was referred for breast reconstruction/reduction procedures.

In March 2011, Plaintiff was evaluated by Dr. Sawan for possible breast "symmetry procedure." (TR 596-597). She reported she was taking the medications Methylin®, Lortab®, and Flexeril®, and she reported she quit smoking in May 2010 and that she was diagnosed as "stage 6" Paget's disease.

Plaintiff underwent a consultative psychological evaluation conducted by Dr. Kahoe, Ph.D., in March 2011. (TR 525-528). Dr. Kahoe noted Plaintiff's gait, posture, and motor behavior were unremarkable. Her mood was anxious, and she described depression and anxiety symptoms with "several" panic attacks a week for the previous six months. Her thought processes were noted to be logical and coherent, her attention and concentration were "mildly impaired," she had average intellectual functioning, and she exhibited some short term memory deficits but she was able to remember three objects for five minutes. The diagnostic assessment was mood disorder not otherwise specified and panic disorder with agoraphobia. (TR 528). Her prognosis was noted to be "good" with appropriate treatment.

Dr. Gerrity, Ph.D., a medical consultant, completed a mental residual functional

5

capacity ("RFC") assessment in March 2011 for the agency. (TR 529-531). Dr. Gerrity opined that based on a review of the evidence in the record Plaintiff could perform simple tasks with routine supervision and interact appropriately with coworkers and supervisors. However, she could not sustain interaction with the general public. (TR 531).

Dr. Woodcock, a medical consultant, completed a physical RFC assessment in November 2010 for the agency. (TR 409-416). Dr. Woodcock opined that based on a review of the evidence in the record Plaintiff could perform an unrestricted range of light work.

The ALJ issued a decision in January 2012 (TR 14-22) in which the ALJ found that Plaintiff had severe impairments due to a history of Paget's disease, depression, and anxiety. (TR 16). Following the agency's well-established sequential evaluation procedure, 20 C.F.R. §§ 404.1520, 416.920, 404.1520a, 416.920a, the ALJ found at step three that Plaintiff's physical and mental impairments did not meet or medically equal the requirements of a listed impairment. At the fourth step, the ALJ found that despite her impairments Plaintiff had the RFC to perform work at the light exertional level involving the performance of simple tasks with routine supervision and no interaction with the general public.

The ALJ found that this RFC for work precluded the performance of Plaintiff's previous jobs. Reaching the fifth and final step of the requisite evaluation procedure, the ALJ found that Plaintiff was capable of performing jobs available in the economy, including, as described by the VE, the jobs of laundry worker, office helper, and silver wrapper. Based on these findings, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. The Appeals Council denied Plaintiff's request for review, and

therefore the ALJ's decision is the final decision of the Commissioner. See 20 C.F.R. §§404.981, 416.1481; Wall v. Astrue, 561 F.3d 1048, 1051 (10th Cir. 2009).

II. Standard of Review

In this case, judicial review of the final Commissioner's decision is limited to a determination of whether the ALJ's factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. Wilson v. Astrue, 602 F.3d 1136, 1140 (10th Cir. 2010); Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). The "determination of whether the ALJ's ruling is supported by substantial evidence must be based upon the record taken as a whole. Consequently, [the Court must] remain mindful that evidence is not substantial if it is overwhelmed by other evidence in the record." Wall, 561 F.3d at 1052 (citations, internal quotation marks, and brackets omitted).

III. Evaluation of Medical Evidence

Plaintiff contends that the ALJ erred by failing to adequately consider her obesity. Social Security Ruling ("SSR") 02-1p requires an ALJ to consider the effects of obesity when assessing a claimant's RFC and advises that "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." SSR 02-1p, "Titles II & XVI: Evaluation of Obesity," 2000 WL 628049, *1 (Sept. 12, 2002). An ALJ may "not make assumptions about the severity of functional

7

effects of obesity combined with other impairments," but must "evaluate each case based on the information in the case record." Id. at *6.

In this case, Plaintiff did not allege that her obesity was a disabling or limiting impairment. At her hearing, Plaintiff stated she was a "little overweight" and that she had purposely gained weight for her cancer treatment. (TR 45). Plaintiff did not describe any limitations due to obesity. Plaintiff points to no specific medical evidence in the record in which treating or examining physicians even noted she was obese or that she was physically limited due to obesity. The only medical evidence cited by Plaintiff are notations in the record regarding her height and her weight, and Plaintiff suggests that these notations "could support a finding of obesity." Plaintiff's Opening Brief, at 6.

The ALJ's decision reflects consideration of the nonmedical and the medical evidence in the record, including the findings on physical examinations of Plaintiff showing she exhibited no edema, normal lung function, and no abnormal gait, posture, or motor behavior. The ALJ also considered the physical RFC assessment by Dr. Woodcock in which Dr. Woodcock found Plaintiff could perform light work. The ALJ did not err in evaluating the evidence in connection with Plaintiff's weight.

Plaintiff asserts that the ALJ also failed to evaluate the evidence properly because the ALJ did not expressly consider the low global assessment of functioning ("GAF") score assessed by the consultative psychological examiner, Dr. Kahoe. In Dr. Kahoe's report of his consultative evaluation of Plaintiff, Dr. Kahoe's diagnostic assessment including the assessment that Plaintiff was functioning with a "current" GAF score of 43. The diagnosis

8

of mental impairments "requires a multiaxial evaluation" in which Axis V "refers to the clinician's assessment of an individual's level of functioning, often by using a Global Assessment of Functioning (GAF), which does not include physical limitations." Schwarz v. Barnhart, No. 02-6158, 2003 WL 21662103, at *3 fn. 1 (10th Cir. July 16, 2003)(unpublished op.)(citing the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)(4th ed. 1994), pp. 25-32). According to the DSM-IV, a GAF score between 41 and 50 describes "serious symptoms" or "any serious impairment in social, occupational, or school functioning."

The ALJ did not err by failing to expressly consider the single, low GAF assessment contained in the record, and, alternatively, any error in the ALJ's failure to expressly consider Dr. Kahoe's GAF assessment was harmless. First, Dr. Kahoe was not a treating physician, and therefore the ALJ was not required to evaluate Dr. Kahoe's report as the opinion of a treating physician under the regulations and pertinent case law. See, e.g., Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003). Secondly, the ALJ found that Plaintiff had severe mental impairments due to depression and anxiety and included specific mental limitations in the RFC finding. See Hargis v. Sullivan, 945 F.2d 1482, 1488 (10th Cir. 1991)("[O]nce a mental impairment is considered to be severe, it must be included in the [RFC] assessment. . . ."); 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3). Furthermore, a low GAF score "does not necessarily evidence an impairment seriously interfering with a claimant's ability to work." Lee v. Barnhart, 117 Fed. Appx. 674, 678 (10th Cir. 2004).

In this case, the ALJ's decision reflects consideration of the clinical observations set

forth in Dr. Kahoe's report, none of which indicated an inability to work. Further, Dr. Kahoe noted that the low GAF assessment was a "current" assessment and that Plaintiff had a "good" prognosis with appropriate treatment, indicating the psychologist's GAF assessment was not indicative of a persistent or long-term low functioning level. (TR 528). The medical consultant, Dr. Gerrity, opined based on a review of the medical and nonmedical evidence in the record, including the report of Dr. Kahoe, that Plaintiff was capable of performing "simple tasks with routine supervision" that did not involve interaction with the general public. (TR 531). The ALJ incorporated Dr. Gerrity's RFC assessment into the RFC finding. There was no medical evidence in the record that Plaintiff had persistently undergone mental health treatment. She was prescribed antidepressant medication by her primary care physician on one occasion in April 2011, but the physician noted only a diagnostic assessment of depression without clinical findings of significant symptoms. (TR 557). The ALJ did not err by failing to expressly consider the one-time low GAF assessment in the consultative psychological examiner's report, and any such error would be harmless.

IV. RFC Assessment

Plaintiff contends that the ALJ's RFC assessment, including the assessment of her credibility, was not supported by substantial evidence in the record. Specifically, Plaintiff contends that the ALJ should have considered the impact of her obesity and her "right upper extremity impairment" upon her RFC for work. Plaintiff's Opening Brief, at 8.

Plaintiff merely lists page numbers in support of her conclusory argument. There is no medical evidence in the record indicating that Plaintiff's RFC was adversely affected

beyond the limitations ascribed by the ALJ by either obesity, as discussed previously, or her right upper extremity. Dr. Prabhu's February 2011 report indicates Plaintiff exhibited an inability to move her right shoulder "past 90 degrees." (TR 572). Dr. Keast noted in February 2011 that Plaintiff exhibited a decreased range of motion in her right shoulder for which muscle relaxant and pain medications were prescribed. (TR 560). The medical evidence reflects that Plaintiff was prescribed physical therapy by her primary care physician in January 2011 for her right shoulder but she failed to attend more than three scheduled physical therapy treatments. (TR 512). Dr. Keast noted in September 2011 that Plaintiff's right arm was "weak" but did not describe any specific objective findings, and the physician referred Plaintiff for physical therapy for her right shoulder. (TR 569). However, there are no further records of physical therapy treatment. The ALJ did not err by failing to include a right upper extremity limitation in the RFC finding.

Plaintiff contends that the ALJ did not make a proper credibility assessment. The assessment of a claimant's RFC at step four generally requires the ALJ to "make a finding about the credibility of the [claimant's] statements about [her] symptom(s) and [their] functional effects." SSR 96-7p, 1996 WL 374186, at * 1 (1996). "Credibility determinations are peculiarly within the province of the finder of fact, and [courts] will not upset such determinations when supported by substantial evidence." <u>Diaz v. Secretary of Health & Human Servs.</u>, 898 F.2d 774, 777 (10th Cir. 1990). An ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements" in determining a claimant's credibility. SSR 96-7p, 1996 WL 374186, at * 4 (1996). Credibility

11

findings must "be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." McGoffin v. Barnhart, 288 F.3d 1248, 1254 (10th Cir. 2002)(quotations and alteration omitted).

In the ALJ's decision, the ALJ listed eight separate reasons for discounting Plaintiff's credibility. (TR 20). Much of Plaintiff's argument is related to her previous assertions of inadequate analysis of the evidence that have been addressed previously. Plaintiff again asserts that she had a right upper extremity impairment, but Plaintiff again merely lists page references to support the argument. The Court should not undertake a copious review of these page references to ascertain their significance in the absence of a cogent argument setting forth what information on these pages would support the Plaintiff's conclusory assertion of error.

Moreover, although some of the ALJ's credibility findings are cryptic and could have been more detailed, the ALJ specifically cited Dr. Woodcock's physical RFC assessment, Dr. Gerrity's mental RFC assessment, and the findings made by Dr. Kahoe regarding Plaintiff's intellectual ability and cognitive functions. The ALJ also refers to Plaintiff's daily activities and the absence of evidence of significant respiratory, cardiac, or musculoskeletal deficits. The ALJ's reasons for the credibility assessment and the RFC finding are well supported by the record.

The VE's testimony, in which the VE identified jobs that would be available for an individual with Plaintiff's RFC for work, provided substantial evidence to support the ALJ's step five determination of nondisability. Consequently, the Commissioner's final decision

should be affirmed.

## RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter AFFIRMING the decision of the Commissioner to deny Plaintiff's applications for benefits. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before     October 20th    , 2014, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. Moore v. United States, 950 F.2d 656 (10th Cir. 1991); cf. Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this   30th    day of    September    , 2014.

/s/ Gary M. Purcell
GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE